FILED
COURT OF APPEALS
DIVISION II

2013 MAY 14 AM 9: 00

STATE OF WASHINGTON

BY_____
                    DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42161-5-II |
| Respondent, | |
| v. | |
| RONALD MELVIN MENDES aka RONALD JOSEPH MENDES, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Ronald Melvin Mendes (aka Ronald Joseph Mendes) appeals his second degree felony murder conviction. He claims that the evidence is insufficient to prove that he acted as a first aggressor and that the victim used reasonable force in attempting to expel Mendes. He also claims that the State failed to disprove that he shot the victim in self-defense and that the trial court violated his right to silence by compelling his testimony. In his statement of additional grounds (SAG),[1] Mendes claims prosecutorial misconduct, failure to sever the murder charge from the other charges, jury instruction errors, double jeopardy, and public trial errors. We affirm because the State presented sufficient evidence to support the jury's felony murder conviction, and Mendes fails to demonstrate prejudicial error.

---

[1] RAP 10.10.

FACTS

In October 2007, Lori Palomo and her boyfriend, Danny Saylor, broke off their long-term live-in relationship. During this break, Palomo met Mendes, and they engaged in a three week intimate relationship that ended when Palomo returned to live with Saylor. Although Palomo lived with Saylor, Mendes occasionally came to Saylor's house to see Palomo.

One night, while Palomo's car was parked at Saylor's house, someone vandalized it; Palomo and Saylor suspected Mendes was the vandal. Thereafter, Saylor did not want Mendes to come over. Palomo asked that Mendes not come around Saylor's house anymore. Judy Anderson, Mendes's stepsister, also cautioned Mendes multiple times not to go there.

In January 2008, despite these warnings, Mendes returned to Saylor's house armed with a loaded .45 caliber gun. Chuck Bollinger, one of two temporary house guests staying in Saylor's living room, met Mendes at the front door. Bollinger advised Mendes that he should not be at Saylor's house; Mendes and Bollinger then went to a gas station where Mendes showed Bollinger the gun. After fueling Mendes's vehicle, they returned to Saylor's house, and Mendes asked Bollinger to wake Saylor so that Mendes could discuss the vandalism incident with Saylor.

Though hesitant to wake Saylor, Bollinger recalled that Saylor instructed Bollinger to wake him if Mendes showed up. Bollinger told Mendes not to bring the gun inside Saylor's house. As Bollinger approached Saylor's front door, Mendes went to the trunk of his vehicle— where Bollinger assumed Mendes would leave the gun. When McKay Brown, Saylor's other house guest, opened the front door to let in Bollinger, Mendes followed Bollinger inside, uninvited. Mendes again insisted that Bollinger wake Saylor, so Bollinger went to Saylor's

2

bedroom to summon him. While Bollinger went to wake Saylor, Brown again advised Mendes to leave. Mendes did not leave.

Learning that Mendes was in his home, Saylor quickly dressed and went to the front room. A brief "ruckus" occurred, in which Saylor pushed Mendes against the front door and the two swung at each other. 7 Verbatim Report of Proceedings (VRP) at 324. Then, the fighting stopped; and moments later, Mendes aimed the gun at Saylor, and said, "I'll smoke you, mother fucker." 8 VRP at 456.

Saylor responded to the threat by ordering Mendes to leave. Saylor left the front room to find his baseball bat, and Bollinger yelled at Mendes again to leave. Saylor spent up to a couple minutes searching in the bedroom, kitchen, and then the laundry room, where he finally found the bat.

As Saylor searched for the bat, Mendes continued to hold the loaded firearm, and Bollinger tried "rushing" Mendes out the door. 7 VRP at 433. When Saylor returned to the front room with his bat in the air, Bollinger had Mendes near the front doorway. Mendes saw Saylor, who said nothing as he approached, and Mendes immediately aimed the firearm and shot Saylor in the chest, inside the front room doorway. Saylor never swung the bat, nor did he say he was going to swing it. He died within seconds of being shot.

The State charged Mendes with second degree intentional murder,[2] second degree felony

---

[2] RCW 9A.32.050(1)(a).

3

No. 42161-5-II

murder,[3] and four counts of witness tampering.[4] Before retrial,[5] the trial court ordered the parties and witnesses not to reference the earlier "trial," to prevent Mendes suffering any unfair prejudice. 2 VRP at 55. After the State's case, Mendes asked the trial court whether he would be entitled to a self-defense instruction based on the State's evidence alone. The trial court declined to decide the motion until both sides rested. Mendes testified that while Saylor searched for the bat, he tried to withdraw from the situation and leave Saylor's property; but, chronic leg and hip pain prevented his moving quickly enough to walk from Saylor's front room to his car parked 20 feet away.

Mendes and the State agreed on all but one jury instruction. They disagreed on an instruction relating to the duty to retreat and to defend against an attack. The trial court did give the jury a self-defense instruction. The jury acquitted Mendes of second degree intentional murder. It convicted him of second degree felony murder, the firearm enhancement, and four counts of witness tampering. Mendes appeals the felony murder conviction.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

Mendes first argues that the State offered insufficient evidence to prove second degree murder. We disagree. When we review the evidence in the light most favorable to the jury's

---

[3] RCW 9A.32.050(1)(b). The second degree murder charges included firearm enhancements.

[4] RCW 9A.72.120.

[5] In 2010, Division One of this court reversed Mendes's conviction and remanded the case for retrial. *State v. Mendes*, noted at 156 Wn. App. 1059 (2010).

4

verdict, there is sufficient evidence to support the second degree felony murder conviction.

## A. Standard of Review

We review insufficient evidence claims for whether, when viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Witherspoon*, 171 Wn. App. 271, 298, 286 P.3d 996 (2012). Sufficiency challenges admit the truth of the State's evidence and all reasonable inferences drawn from it. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980).

The trier of fact makes credibility determinations, and we will not review those determinations. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). We also defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

## B. First Aggressor

First, Mendes argues that the State failed to prove that he acted as the first aggressor. We disagree because, viewing the evidence in the light most favorable to the jury's verdict, Mendes entered Saylor's house unwelcomed, then he pointed a gun and threatened to shoot the unarmed Saylor.

Palomo and Anderson cautioned Mendes that he was not welcome at Saylor's home. Knowing he was not welcome, Mendes nonetheless went to Saylor's house near midnight, where Bollinger again reminded Mendes that he was not welcome and that Saylor was angry with him. Bollinger advised Mendes to leave and specifically told him not to bring the loaded firearm into

5

the house; but still, Mendes entered the house, uninvited and armed, and he demanded that Bollinger wake Saylor.

Brown testified that once Bollinger summoned Saylor to the front room, the two fought and Saylor pushed Mendes against the front door, where the two swung at each other. According to Brown, the two then stopped fighting, and Mendes aimed the gun at Saylor, threatened to "smoke" him, and called him derogatory names. 7 VRP at 328. It was only after this threat of deadly force, that Saylor armed himself with a baseball bat.

Viewing the evidence in a light most favorable to the jury's verdict, any rational trier of fact could have found that Mendes acted as a first aggressor by precipitating a fight. Accordingly, sufficient credible evidence demonstrated that Mendes's conduct precipitated the fight by acting as the first aggressor. *See Witherspoon*, 171 Wn. App. at 298.

### C. Reasonable Force

Mendes next claims that the State failed to prove that Saylor used reasonable force to expel Mendes from Saylor's home. We disagree. Any rational jury could have found that because Mendes threatened deadly force, Saylor reasonably armed himself with a bat.

When a person is assaulted in a place where he has a right to be, he has no duty to retreat. *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003). Under state law:

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
> (3) Whenever used by a party about to be injured . . . or a malicious trespass . . . in case the force is not more than is necessary.

6

RCW 9A.16.020(3). And a person is justified in using reasonable force in self-defense when facing the appearance of imminent danger. *State v. Bradley*, 141 Wn.2d 731, 737, 10 P.3d 358 (2000).

After learning that Mendes was in his home, uninvited in the middle of the night, Saylor approached Mendes and the two fought briefly before stopping. Mendes then pulled a gun and threatened Saylor, who ordered Mendes to leave. Witnesses said Saylor left the front room for anywhere between 10 seconds to "a couple minutes." 7 VRP at 334. During this time, Brown and Bollinger reiterated Saylor's order that Mendes leave, and Brown added that Mendes should drop his gun. Mendes did not drop his gun and surrender; instead, when he saw Saylor return to the front room with a bat—apparently to forcibly eject Mendes—Mendes raised his weapon and fired.

Saylor had no duty to retreat. Viewing this evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found that Saylor's use of a baseball bat was reasonable force to expel the armed and uninvited Mendes from his house in the middle of the night. Accordingly, there was sufficient evidence from which any rational jury could conclude that Saylor used reasonable force. *See Witherspoon*, 171 Wn. App. at 298.

D. Disprove Self-Defense

Next, Mendes claims that the State failed to disprove that Mendes shot Saylor in self-defense after withdrawing from the altercation. Again, we reject his argument.

A defendant who initially provokes a victim to act with force cannot claim self-defense. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Specifically, an aggressor who provoked the altercation in which he killed another person, cannot successfully invoke self-

defense to justify or excuse the homicide, unless he in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action. *State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973).

*State v. Dennison*, 115 Wn.2d 609, 801 P.2d 193 (1990), is instructive. Dennison was burglarizing an apartment in a house while armed with a gun. *Dennison*, 115 Wn.2d at 612-13. A resident caught Dennison in the home, and Dennison moved to the front porch where he told the resident that he had not taken anything, that "it was all over," and that he wanted to leave. *Dennison*, 115 Wn.2d at 613. The resident then shot at Dennison, who returned fire, eventually killing the resident. *Dennison*, 115 Wn.2d at 613.

At trial, Dennison argued that he had withdrawn from being the aggressor, reviving his self-defense claim. *Dennison*, 115 Wn.2d at 617. But our Supreme Court rejected this argument, holding that if Dennison had truly intended to withdraw from the burglary and communicated his withdrawal to the decedent, he would have dropped his gun or surrendered. *Dennison*, 115 Wn.2d at 618. Because Dennison still held his gun, although pointed to the ground, this action did not clearly manifest a good faith intention to withdraw from a burglary or remove the decedent's fear. *Dennison*, 115 Wn.2d at 618.

At the outset, it is important to note that the Supreme Court held that Dennison was not even entitled to assert self-defense, *Dennison*, 115 Wn.2d at 616; but here, however, the trial court instructed the jury regarding self-defense. Instead, Mendes asserts that the State did not sufficiently disprove that he acted in self-defense. Although Mendes states that after he aimed his gun and threatened to kill Saylor, he withdrew from the altercation and attempted to leave

Saylor's house, the jury was free to reject those facts. Like *Dennison*, Mendes did not demonstrate good-faith intent to withdraw; he did not drop his weapon or unload its ammunition. He continued to hold the loaded gun in his shooting hand. Mendes did not communicate his intent to withdraw or surrender in any way. And though he claimed to withdraw, Mendes fired at Saylor the instant he next saw him. Viewing this evidence in a light most favorable to the jury's verdict, any rational trier of fact could have found that Mendes did not express an intent to withdraw in good faith; accordingly, the State offered sufficient evidence to disprove Mendes's self-defense claim. *See Witherspoon*, 171 Wn. App. at 298.

## II. MENDES'S RIGHT TO SILENCE

Mendes next argues that the trial court improperly compelled him to testify when it declined to rule whether the State's evidence alone entitled him to a self-defense instruction. We reject this argument for two reasons. First, Mendes is not entitled to an advisory ruling on jury instructions before the close of all the evidence. Second, Mendes's decision to testify was a voluntary and tactical decision, and Mendes offers no evidence that he was forced or compelled to testify. Accordingly, Mendes's arguments fail.

Although CrR 6.15(a) tells us when parties must offer proposed jury instructions, neither this rule nor other court rules tell us whether a court is required to decide if a defendant is entitled to a self-defense instruction at the close of the State's case. Mendes provides no authority and we have found none that would require a court to issue a ruling regarding self-defense instructions before the close of all the evidence. We therefore reject this contention.

In a related argument, Mendes claims that the trial court compelled him to testify because it declined to state at the close of the State's evidence whether he was entitled to a self-defense

instruction. Again, we reject this argument as not well founded. The Fifth Amendment of the federal constitution, and article 1, section 9 of the Washington Constitution protect an accused from being compelled to testify against himself at trial. We interpret these two constitutional provisions the same. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). "'Compelled'" connotes that the accused was forced to testify against his will or that he offered his testimony under compulsion and over his objection. *State v. Van Auken*, 77 Wn.2d 136, 138, 460 P.2d 277 (1969) (quoting *State v. Jeane*, 35 Wn.2d 423, 433, 213 P.2d 633 (1950)).

In *State v. Foster*, Foster argued that the trial court compelled his testimony when it failed to inform him that it would instruct the jury on second degree negligent assault—had he known, he would not have testified. 91 Wn.2d 466, 472-73, 589 P.2d 789 (1979). Our Supreme Court rejected Foster's argument noting, "[T]here is no evidence of compulsion to testify in this case; rather, the record reflects that the defendant voluntarily testified in seeking to exculpate himself. Appellant was represented at trial by counsel and made the tactical decision to testify." *Foster*, 91 Wn.2d at 473.

Here, the trial court did not rule that a self-defense instruction hinged on Mendes testifying. The trial court stated that, if Mendes could provide any authority to support granting an advisory ruling, the trial court would consider offering one. Mendes provided no such authority. Instead, he made the tactical decision to testify, to ensure that he would receive a self-defense instruction. As in *Foster*, here the trial court did not compel a defendant's testimony because "the defendant voluntarily testified in seeking to exculpate himself." *Foster*, 91 Wn.2d at 473. Because Mendes cannot demonstrate that the trial court forced him to testify against his

will, or that he testified under compulsion and over his objection, he fails to demonstrate that the trial court compelled his testimony.

### III. STATEMENT OF ADDITIONAL GROUNDS

Mendes raises five additional claims in his SAG: (1) prosecutorial misconduct, (2) failure to sever the murder and witness tampering charges, (3) jury instruction errors, (4) double jeopardy, and (5) public trial errors. These claims are without merit.

First, Mendes claims that the State violated a pretrial order that neither the parties nor their witnesses could refer specifically to Mendes's "prior trial" before the jury. 2 VRP at 55-56. The trial court said they may say "last proceeding" or "last hearing," just not "trial." 12 VRP at 1175. Here, the State said "prior proceeding," not "prior trial." 12 VRP at 1173. Accordingly, Mendes cannot demonstrate prosecutorial misconduct because the State did not err.

Next, Mendes argues that the State erred by denying his motion to sever the witness tampering from the murder charges. Because the record does not demonstrate a timely severance motion, Mendes failed to preserve this issue for appeal.

Mendes also argues that the trial court failed to give a full revived self-defense instruction. Mendes, however, failed to object to this alleged error at trial, and he agreed with and supported the State's proposed revived self-defense instruction. The invited error doctrine precludes a party from setting up an error at trial and then complaining of it on appeal. CrR 6.15(c); *State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990). Because Mendes invited this alleged error, he cannot now complain of it on appeal.

Mendes next argues that the State subjected him to double jeopardy when it tried him for second degree murder on two theories—intentional murder and felony murder. But the State

may charge and prosecute a defendant for alternative means of committing the same crime. *State v. Womac*, 160 Wn.2d 643, 660 n.9, 160 P.3d 40 (2007). Here, the State charged Mendes with both intentional murder and felony murder under the second degree murder statute; and, because the jury only convicted Mendes of felony murder, Mendes was never subjected to double jeopardy.

Finally, Mendes argues that the trial court erred in closing the courtroom to visitors during voir dire because the courtroom was too full, violating his public trial rights. His claim, however, involves matters outside the record. The record never mentions the trial court closing the courtroom during voir dire. Accordingly, we are unable to address this issue on direct appeal. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Quinn-Brintnall, J.

Bjorgen, J.